[No. S161385. Nov. 2, 2009.]

DAVID B. SCHACHTER, Plaintiff and Appellant, v.
CITIGROUP, INC., et al., Defendants and Respondents.

Counsel

Law Offices of Ashley D. Posner, Ashley D. Posner and Barbara Brudno for Plaintiff and Appellant.

Skadden, Arps, Slate, Meagher & Flom, Raoul D. Kennedy, Joren S. Bass, Joan Shreffler, Douglas B. Adler, Seth M. Schwartz, Jeffrey W. McKenna, William P. Frank, Preeta D. Bansal and Sarah E. McCallum for Defendants and Respondents.

Ira Hammerman, Kevin Carroll; Morgan, Lewis & Bockius, Sam S. Shaulson, Thomas M. Peterson, Carrie A. Gonell; National Chamber Litigation Center, Inc., Robin S. Conrad and Shane B. Kawka for Chamber of Commerce of the United States of America and Securities Industry and Financial Markets Association as Amici Curiae on behalf of Defendants and Respondents.

Opinion

MORENO, J.—Citigroup, Inc., offered a voluntary employee incentive compensation plan that provides employees with shares of restricted company stock at a reduced price in lieu of a portion of that employee's annual cash compensation. Employees agree that, should they resign or be terminated for cause before their restricted shares of stock vest, they would forfeit the stock and the portion of cash compensation they directed be paid in the form of the restricted stock. We consider here whether the incentive plan's forfeiture provision violates Labor Code sections 201, 202, and 219, which provide that employees be paid all earned, unpaid wages upon termination or resignation and prohibit agreements that purport to circumvent that requirement. We conclude the forfeiture provision does not run afoul of the Labor Code because no earned, unpaid wages remain outstanding upon termination according to the terms of the incentive plan. Accordingly, we affirm the judgment of the Court of Appeal.

## Background

David B. Schachter was employed as a stockbroker by Smith Barney, Inc., now a subsidiary of Citigroup, Inc. (the company), from April 28, 1992, to

March 29, 1996. Schachter, along with officers and other key individuals in the company's employ, was given the option to participate in the company's capital accumulation plan (the Plan),[1] a program that provided incentives to those employees who directly influenced the company's value.

Under the Plan, eligible employees could elect to receive awards of restricted company stock "in lieu of cash payment of a percentage of the employee's annual compensation." Participating employees could elect to receive 5, 10, 15, 20, or 25 percent of their "total compensation in the form of restricted stock." To participate in the Plan for the following calendar year, an employee had to execute a "Capital Accumulation Plan Election to Receive Restricted Stock" form at the end of the current calendar year indicating the amount of "total compensation in the form of restricted stock" he or she wished to receive. The percentage of "total compensation" received as restricted stock could be different for the first and second six-month periods of the year.

Restricted stock could not be sold, transferred, pledged, or assigned for a two-year period commencing on the date of the award; however, the Plan provided that participating employees "shall have the right to direct the vote" and "receive any regular dividends on restricted stock shares" during the restricted period.[2]

For purposes of determining the number of shares to be acquired under the Plan, the purchase price of the stock was discounted at a rate of 25 percent of its then current market price, averaged over the five days preceding the date of the acquisition, to "reflect the impact of the restrictions on the value of the restricted stock, as well as the possibility of forfeiture of restricted stock." On the date of the purchase, the company either issued stock certificates to a participating employee, to be held by the company until the restricted period lapsed, or made a "book entry" in the company's records evidencing the award. Although a participating employee could elect to pay taxes on the restricted stock when the stock was purchased (see 26 U.S.C. § 83), "the participating employees' restricted shares [were] not included in the participating employees' gross income for federal tax purposes until the two-year vesting period had expired."

---

[1] Traveler's Group, Inc., the publicly traded parent company of Smith Barney, originally sponsored the Plan. Traveler's Group, Inc., and Citicorp merged to form Citigroup, Inc.

[2] Plan participants' rights to extraordinary dividends are determined at the sole discretion of the nominations and compensation committee of the board of directors.

If an employee remained in the company's employ for the two years following the purchase of restricted stock, title to the shares vested fully with the employee, free of any restrictions. However, if an employee voluntarily terminated employment or was terminated for cause before the end of the two-year period, the employee forfeited his or her restricted stock as well as the percentage of annual income designated by the employee to be paid as shares of restricted stock. In contrast, if an employee was involuntarily terminated without cause, the employee forfeited his or her restricted stock, but received in return, without interest, "a cash payment equal to the portion of his or her annual compensation that had been paid in the form of such forfeited [r]estricted [s]tock."

On December 21, 1994, Schachter enrolled in the Plan, and elected to receive 5 percent of his total compensation in 1995 in the form of restricted stock for both six-month periods. On July 1, 1995, Schachter received 44 shares of restricted stock with a vesting date of July 1, 1997, and on January 2, 1996, he received 38 shares of restricted stock with a vesting date of January 2, 1998. At the end of 1995, Schachter again elected to participate in the Plan during the 1996 calendar year, but modified his election such that no restricted stock would be purchased during the first half of 1996, and 5 percent of his total compensation between July and December 1996 would constitute restricted stock. On March 31, 1996, Schachter voluntarily terminated his employment with the company. Because Schachter's resignation occurred prior to the vesting dates of his restricted stock, he forfeited all of his shares of stock and the percentage of his annual compensation he directed be paid to him in the form of restricted stock.

In May 1998, Schachter filed a putative class action against the company alleging (1) that the Plan's forfeiture provision violated Labor Code[3] sections 201[4] and 202,[5] which require the prompt payment of all earned wages when an employee is terminated or when an employee resigns, (2) that the Plan's forfeiture provision violated section 221,[6] which prohibits an employee from returning wages to an employer, and (3) that forfeiture of the percentage of annual compensation received in the form of shares of stock constituted the

---

[3] All subsequent statutory references are to the Labor Code unless otherwise noted.

[4] Section 201 provides, in pertinent part, "If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately." (§ 201, subd. (a).)

[5] Section 202 provides, "If an employee . . . quits his or her employment, his or her wages shall become due and payable not later than 72 hours thereafter . . . ." (§ 202, subd. (a).)

[6] Section 221 provides, "It shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee."

unlawful conversion of wages. The company filed a motion for summary judgment or adjudication, which the trial court denied in its entirety on October 20, 1998.

Years of litigation followed, and after a class consisting of former employees "who have suffered financial damages as a result of the forfeiture provisions of the [P]lan" was certified, and an intervening appeal (*Schachter v. Citigroup, Inc.* (2005) 126 Cal.App.4th 726 [23 Cal.Rptr.3d 920]) was completed, the trial court "elected to exercise its inherent authority to reconsider its original denial of the [company's summary judgment] motion in accordance with *Le Francois v. Goel* [(2005)] 35 Cal.4th 1094 [29 Cal.Rptr.3d 249, 112 P.3d 636]."[7] Upon reconsideration, the trial court concluded that the Plan's forfeiture provision did not violate sections 201 and 202, and it granted the company's motion for summary judgment. Schachter appealed, and the Court of Appeal affirmed the trial court's grant of summary judgment.

The Court of Appeal concluded that the Plan's forfeiture provision did not violate sections 201 and 202, and, accordingly, the Plan did not violate section 219, which provides that wage payment statutes, among others, cannot "be contravened or set aside by private agreement." Schachter argued that the forfeiture provision violated the Labor Code because an employee's resignation or termination for cause resulted in the employee's forfeiture of "not only the shares of the restricted [company] stock they had purchased," which Schachter conceded was lawful, "but also the 'earned but unpaid compensation' used to purchase those shares." In rejecting Schachter's argument, the court concluded that Schachter was paid all of his earned wages—some in the form of restricted stock with an immediate right to vote and earn dividends, and some in the form of cash compensation. The court also reasoned (and Schachter conceded) that if he had been paid all of his compensation in cash and then used a portion of those paid wages to purchase restricted stock, no Labor Code violation would have occurred. The court concluded that the only difference between the instant transaction and a certainly lawful two-step transaction in which the company paid Schachter and then permitted him to use his earnings to purchase restricted stock was the Plan's tax deferral benefits. The court found that "at most, the omission of the intermediate step

---

[7] Between the trial court's initial denial and eventual grant of the company's summary judgment motion, Schachter amended his complaint three times, the company filed a second summary judgment motion against the third amended complaint, and the case was reassigned to a different trial judge during the pendency of that second summary judgment motion. The trial court granted the second summary judgment motion, and the Court of Appeal reversed, concluding that the motion was improper pursuant to Code of Civil Procedure section 437c, subdivision (f), which prohibits a party from filing a summary judgment motion based on issues asserted in a prior summary adjudication motion unless there is ·a showing of newly discovered facts or a pertinent change in the law.

of delivering the money to [Schachter] before implementing his request to use it to purchase the designated restricted stock amounts to a deduction of wages for an authorized use, a transaction expressly permitted by section 224."[8]

Schachter also argued that the Plan's forfeiture provision amounted to a deferral and withholding of wages because the shares lacked ascertainable value and therefore did not constitute a wage. The court rejected his argument, explaining that the shares of restricted stock had value and constituted a wage within the meaning of section 200.[9] The court explained that Schachter received these wages and no wages were deferred or withheld. Alternatively, the court opined that if Schachter was correct and the restricted stock did not constitute a wage, his claim would nonetheless fail because forfeiture of the stock (that is, forfeiture of something that is not a wage) would not violate the Labor Code.

Finally, the court reasoned that even if it accepted Schachter's argument that he was never paid wages either as cash or as restricted stock, his claim that the Plan's forfeiture provision violated the Labor Code "would still fail as a matter of law because he could not show the funds used to purchase the shares were actually earned." The court explained, "Under basic incentive compensation plans the point at which the wage is actually earned is determined by the parties' agreement." Payment of incentive compensation may be contingent upon the happening of a future event, such as continued employment. Relying on *Neisendorf v. Levi Strauss & Co.* (2006) 143 Cal.App.4th 509, 524 [49 Cal.Rptr.3d 216] (*Neisendorf*), which held that an employee is not eligible to receive a bonus if his or her employment terminates prior to the happening of a contingent future event such as employment on a specified date, the court explained that Schachter "elected not to remain [in the company's employ] for the designated period (presumably after making a calculated decision that the economic and noneconomic reasons to leave outweighed the reasons to stay, which included completing the required services needed to earn the restricted stock). Accordingly,

---

[8] Section 224 provides, in pertinent part, that "[t]he provisions of Sections 221 [prohibiting the repayment of a wage to an employer], 222 [prohibiting the withholding of a wage] and 223 [prohibiting secretly paying less than a statutorily mandated or contractually agreed-upon wage] shall in no way make it unlawful for an employer to withhold or divert any portion of an employee's wages when the employer is required or empowered so to do by state or federal law or when a deduction is expressly authorized in writing by the employee to cover . . . deductions not amounting to a rebate or deduction from the standard wage . . . pursuant to wage agreement . . . ."

[9] Section 200 defines a wage as "all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation." (§ 200, subd. (a).)

Schachter did not earn—and thus had no right to receive—either the restricted stock or the funds used to purchase it." We granted Schachter's petition for review.

## Discussion

We review de novo a trial court's grant of summary judgment along with its resolution of any underlying issues of statutory construction. (*Barner v. Leeds* (2000) 24 Cal.4th 676, 683 [102 Cal.Rptr.2d 97, 13 P.3d 704].) A trial court may only grant a motion for summary judgment if no triable issues of material fact appear and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *State of California v. Allstate Ins. Co.* (2009) 45 Cal.4th 1008, 1017 [90 Cal.Rptr.3d 1, 201 P.3d 1147].) The evidence must be viewed in the light most favorable to the nonmoving party. (See *Binder v. Aetna Life Ins. Co.* (1999) 75 Cal.App.4th 832, 839 [89 Cal.Rptr.2d 540].)

■ To ascertain whether the Plan's forfeiture provision violates sections 201 and 202, we must first address whether Schachter (or any class member) would be owed—and therefore would be required to forfeit—any "earned and unpaid" wages upon resigning or being terminated for cause. (§ 201, subd. (a).) A wage is defined as "all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation." (§ 200, subd. (a).) We construe the term "wages" broadly to "include not only the periodic monetary earnings of the employee but also the other benefits to which he is entitled as a part of his compensation." (*Wise v. Southern Pac. Co.* (1970) 1 Cal.3d 600, 607 [83 Cal.Rptr. 202, 463 P.2d 426].) "Courts have recognized that 'wages' also include those benefits to which an employee is entitled as a part of his or her compensation, including money, room, board, clothing, vacation pay, and sick pay. (E.g., *Suastez v. Plastic Dress-Up Co.* (1982) 31 Cal.3d 774, 780 [183 Cal.Rptr. 846, 647 P.2d 122]; *Department of Industrial Relations v. UI Video Stores, Inc.* (1997) 55 Cal.App.4th 1084, 1091 [64 Cal.Rptr.2d 457].)" (*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1103 [56 Cal.Rptr.3d 880, 155 P.3d 284].) Incentive compensation, such as bonuses and profit-sharing plans, also constitutes wages. (See *Neisendorf, supra,* 143 Cal.App.4th at p. 522; *Lucian v. All States Trucking Co.* (1981) 116 Cal.App.3d 972, 974 [171 Cal.Rptr. 262]; *Ware v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1972) 24 Cal.App.3d 35, 44 [100 Cal.Rptr. 791].)

Schachter alleges that the percentage of his annual compensation he directed be paid to him in the form of shares of restricted stock constitutes a wage that remained earned but unpaid following his resignation. We disagree. Certainly all cash compensation Schachter received constituted a wage. The Court of Appeal concluded, and we agree, that the shares of restricted stock issued to Schachter also constituted a wage. The company does not dispute that both the cash compensation and restricted stock—including the "conditional present rights (voting and dividend rights)," as well as "contingent future rights of full ownership in that restricted stock" (awarded but never transformed into noncontingent, fully vested rights)—constituted wages. Schachter does not contest these conclusions, and does not allege that the company failed to pay him the compensation he elected to receive as cash or the shares of restricted stock upon his termination. Instead, Schachter alleges that the portion of his cash compensation he directed be paid to him in the form of restricted stock should have been paid to him in cash upon his resignation.

Schachter makes this argument in a somewhat convoluted fashion, alleging here, as he did before the Court of Appeal, that the Plan is illegal and unenforceable pursuant to section 219 (prohibiting agreements that attempt to circumvent the requirements of the Labor Code), and a court would be precluded from denying his wage claim under section 202 (regarding the timely payment of wages upon termination) based upon the terms of the Plan despite the fact that Schachter voluntarily enrolled in the Plan. The company argues, however, and we agree, that "Schachter has put the cart before the horse." Before Schachter can argue that the Plan constitutes an improper agreement under section 219, he must demonstrate that the Plan's forfeiture provision violates sections 201 and 202, the statutes governing wage payment upon termination or resignation. This he cannot accomplish.

■ Schachter correctly suggests that section 219 prohibits an employer and employee from agreeing, even voluntarily, to circumvent provisions division 2, part 1, chapter 1, of article 1 (consisting of §§ 200–243) of the Labor Code. Schachter also correctly argues that "agreement[s] *prospectively* waiving an employee's rights under sections 201 [and 202] to receive all his or her earned but deferred or unpaid wages . . . constitute . . . waivers which section 219 renders illegal and unenforceable." However, it is settled that an employer may unilaterally alter the terms of an employment agreement, provided such alteration does not run afoul of the Labor Code. (*DiGiacinto v. Ameriko-Omserv Corp.* (1997) 59 Cal.App.4th 629, 637 [69 Cal.Rptr.2d 300] (*DiGiacinto*); see 3 Witkin, Summary of Cal. Law (10th ed. 2005) Agency and Employment, § 236 [unilateral reduction in wage].) "There is, of course, a strong common law presumption that an employee may be demoted at will.

Since it is presumed that an employee may be discharged at will (Lab. Code, § 2922), the at-will presumption would surely apply to lesser quant[a] of discipline as well." (*Scott v. Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454, 464–465 [46 Cal.Rptr.2d 427, 904 P.2d 834]; see *DiGiacinto, supra,* 59 Cal.App.4th at pp. 634–635.) The at-will presumption authorizing an employer to discharge or demote an employee similarly and necessarily authorizes an employer to unilaterally alter the terms of employment, provided that the alteration does not violate a statute or breach an implied or express contractual agreement. (*Scott v. Pacific Gas & Electric Co., supra,* 11 Cal.4th at p. 465; *DiGiacinto, supra,* 59 Cal.App.4th at p. 637.) An "employee who continues in the employ of the employer after the employer has given notice of changed terms or conditions of employment has accepted the changed terms and conditions." (*DiGiacinto, supra,* 59 Cal.App.4th at p. 637.)

■ It cannot be questioned that employers and employees are free to *prospectively* and *bilaterally* alter the terms of employment. As we recently noted, " '[s]traight-time wages (above the minimum wage) are a matter of private contract between the employer and employee.' " (*Gentry v. Superior Court* (2007) 42 Cal.4th 443, 456 [64 Cal.Rptr.3d 773, 165 P.3d 556], quoting *Earley v. Superior Court* (2000) 79 Cal.App.4th 1420, 1430 [95 Cal.Rptr.2d 57].) Here, when Schachter submitted his Plan election form in December 1994, he agreed to a restructured compensation package for the following year that included a lower annual salary and payment in the form of restricted stock "subject to all of the provisions and administrative rules of the Plan." Again, in 1995, Schachter submitted a Plan election form requesting that he be paid entirely in cash during the first six months of 1996, and in cash and restricted stock during the latter six months of 1996. He acknowledged that his resignation or termination for cause before the end of the two-year vesting period would result in forfeiture of the restricted stock and the percentage of his compensation that he "authorized to be paid in the form of such restricted stock."

Schachter does not contest that he received all of the cash compensation to which he was entitled. Instead, he argues that the portion of compensation he directed be paid to him in the form of restricted stock should have been transformed into a cash payment upon his resignation. This argument is unavailing. When he executed the Plan election forms, Schachter essentially renegotiated the terms of his compensation with the company. Schachter elected to be compensated with a mixture of cash and restricted stock in 1995, and for one six-month period in 1996. He also elected to be paid wholly in cash for one six-month period in 1996. Schachter understood that

the restricted stock he opted to receive would have limited and conditional present value and would not fully vest until two years following the date he received it, provided he remained employed by the company. As the Court of Appeal explained, "Schachter necessarily agreed his compensation would consist of cash payments and a retention-based conditional interest in the shares, with the latter being earned only if he remained with [the company] for two years. He elected not to remain for the designated period . . . . Accordingly, Schachter did not earn—and thus had no right to receive—either the restricted stock or the funds used to purchase it."

■ Schachter's compensation, by his tacit agreement, consisted of a mixture of cash and incentive compensation. Incentive compensation, whether in the form of a traditional cash bonus program or a more complex restricted stock plan, is generally understood as an " 'inducement to employees to procure efficient and faithful service.' " (Dept. of Industrial Relations, Div. of Labor Stds. Enforcement (DLSE), Enforcement Policies and Interpretations Manual (Rev. 2006) § 35.1, quoting *Duffy Bros. v. Bing & Bing* (N.Y.App.Div. 1926) 217 A.D. 10 [215 N.Y.S. 755, 758].) Eligibility to receive incentive compensation "is properly determined by the . . . plans' specific terms and general contract principles." (*Neisendorf, supra*, 143 Cal.App.4th at p. 523.) While "[t]he public policy in favor of full and prompt payment of an employee's earned wages is fundamental and well established . . ." (*Smith v. Superior Court* (2006) 39 Cal.4th 77, 82 [45 Cal.Rptr.3d 394, 137 P.3d 218]), "nothing in the public policy of this state concerning wages . . . transforms [a] contingent expectation of receiving bonuses into an entitlement" (*Neisendorf, supra*, 143 Cal.App.4th at p. 522). Only when an employee satisfies the condition(s) precedent to receiving incentive compensation, which often includes remaining employed for a particular period of time, can that employee be said to have earned the incentive compensation (thereby necessitating payment upon resignation or termination). (*Ibid.*; *Lucian v. All States Trucking Co., supra*, 116 Cal.App.3d at p. 975 ["[A]n employee who voluntarily leaves his employment before the bonus calculation date is not entitled to receive it."].)

■ Here, of course, Schachter voluntarily terminated his employment before his restricted stock fully vested. By the terms of the Plan, and Schachter's own concession, he is not entitled to those unvested shares of restricted stock. Having elected to receive some of his compensation in the form of restricted stock, a transaction he was aware carried risk as well as the potential for reward, Schachter cannot now assert that he should have been paid in cash that portion of his compensation he elected to receive as

restricted stock.[10] As the company persuasively argues, Schachter's "bargained-for 'wages' have been paid in full. He received all of his promised cash compensation, received immediately exercisable voting and dividend rights in the restricted stock, and was awarded contingent rights of full ownership in that stock. The only thing that has not been 'paid' is something Schachter never 'earned'—fully vested [company] stock. Schachter therefore has no claim under [section] 201 or [section] 202."

■ We note that had Schachter been involuntarily terminated by the company without cause, he would have been required to forfeit his shares of restricted stock in exchange for "a cash payment equal to the portion of his or her annual compensation that had been paid in the form of such forfeited [r]estricted [s]tock," "without interest." This provision is consistent with contract law principles prohibiting efforts by one party to a contract to prevent completion by the other party. (See DLSE, Enforcement Policies and Interpretations Manual, *supra*, § 35.5.) "If the employee is discharged before completion of all of the terms of the bonus agreement, and there is not valid cause, based on conduct of the employee, for the discharge, the employee may be entitled to recover at least a pro-rata share of the promised bonus." (*Ibid.*; see DLSE Opn. Letter No. 1987.06.03 (June 3, 1987).) In the analogous context of commissions on sales, it has long been the rule that termination (whether voluntary or involuntary) does not necessarily impede an employee's right to receive a commission where no other action is required on the part of the employee to complete the sale leading to the commission payment. (See *Willison v. Turner Resilient Floors* (1949) 89 Cal.App.2d 589 [201 P.2d 406].) This concept has been colorfully described as " ' "He who shakes the tree is the one to gather the fruit." ' " (*E. A. Strout Western Realty Agency, Inc. v. Lewis* (1967) 255 Cal.App.2d 254, 259 [62 Cal.Rptr. 918], quoting *Sessions v. Pacific Improvement Co.* (1922) 57 Cal.App. 1, 18 [206 P. 653]; see also DLSE, Enforcement Policies and Interpretations Manual, *supra*, § 34.6.)

Here, Schachter's actions—not the company's—resulted in the loss of Schachter's contingent incentive compensation. As such, Schachter is not entitled to "gather the fruit" because he failed to perform the condition

---

[10] Schachter argues that a determination that he did not earn the shares or the cash compensation he elected to receive as shares of restricted stock "renders the Plan's income tax deferral a sham if not an outright fraud." However, as the Plan indicates, the tax benefit is gained from deferring taxes on awards of restricted stock until vesting occurs. Because title 26 United States Code section 83 requires that property must be subject to a "substantial risk of forfeiture" in order to qualify for tax deferral, providing payment upon an employee's resignation or termination for cause would in all likelihood jeopardize the validity of the tax deferral.

necessary to do so—in this case, remain employed with the company until two years had passed from the date he received the restricted stock. We conclude that the Plan's forfeiture provision does not run afoul of section 201 or 202 because no earned wages remain unpaid upon termination for cause or resignation. Because Schachter's claim that the Plan violated section 219 was based on the faulty premise that the Plan's forfeiture provision violated sections 201 and 202, we conclude that Schachter's argument that the Plan violates section 219 also fails.

Schachter additionally asserts that his incentive compensation, like vacation pay, should vest on a pro rata basis, entitling him to at least some payment upon resignation. We disagree. In *Suastez v. Plastic Dress-Up Co., supra*, 31 Cal.3d 774, 781 (*Suastez*), we held that vacation pay begins vesting as soon as the employee has performed substantial services for his or her employer. Under Plastic Dress-Up Company's vacation policy, employees were not eligible for any vacation pay unless they remained employed on the first anniversary of their start date. (*Id.* at p. 778.) We found the policy established "a condition subsequent which attempts to effect a forfeiture of vacation pay already vested," which is expressly prohibited by section 227.3. (*Suastez, supra*, 31 Cal.3d. at p. 781; see § 227.3 ["[A]n employment contract or employer policy shall not provide for forfeiture of vested vacation time upon termination."].) We stated that because "some share of vacation pay is earned daily, it would be both inconsistent and inequitable to hold that employment on an arbitrary date is a condition precedent to the vesting of the right to such pay." (*Suastez, supra*, 31 Cal.3d at p. 782.)

Contrary to Schachter's assertion, our ruling in *Suastez* was limited to vacation pay and cannot extend to voluntary incentive programs, like the one at issue in this case. In fact, we expressly acknowledged "that vacation pay is not an inducement for future services, but is compensation for past services." (*Suastez, supra*, 31 Cal.3d at p. 782.) As explained above, the purpose of incentive compensation is to serve as an " 'inducement to employees to procure efficient and faithful service.' " (DLSE, Enforcement Policies and Interpretations Manual, *supra*, § 35.1, quoting *Duffy Bros. v. Bing & Bing, supra*, 215 N.Y.S. at p. 758.) Under our analysis in *Suastez*, Schachter's argument that his incentive compensation somehow vested like vacation pay necessarily fails because we concluded in *Suastez* that "[i]f vacation pay served simply to induce employees to remain on the job for a certain period of time, then interpreting eligibility requirements as a condition precedent to the vesting of vacation pay would not be unreasonable." (*Suastez, supra*, 31 Cal.3d at p. 782.)

## Conclusion

The judgment of the Court of Appeal is affirmed.

George, C. J., Baxter, J., Werdegar, J., Chin, J., McConnell, J.,* and Ramirez, J.,† concurred.

---

*Presiding Justice, Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

†Presiding Justice, Court of Appeals, Fourth Appellate District, Division Two, assigned by the Chief Justice pursuant to aricle VI, section 6 of the California Constitution.